140 F.3d 91
 Stephen M. CATANZARO; Warren Kautz; Rashon Lal,
Plaintiffs-Appellants,
v.
Sara WEIDEN, Defendant,
City of Middletown, New York; Hyman Weiden; Joseph
Destephano, Esq., Mayor, sued in his Official and Individual
capacities; Alfred A. Fusco, sued in his Official and
Individual capacities, Defendants-Appellees.
 No. 256, Docket 97-7140.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 25, 1997.
Decided March 17, 1998.
 
 Michael H. Sussman, Goshen, NY (Sussman, Bergstein, Wotorson and Whateley, Goshen, NY, Helen Ullrich, Stephen Bergstein, of counsel), for Plaintiffs-Appellants.
 Monte J. Rosenstein, Middletown, NY (Rosenstein, McKenna and Bonney, Middletown, NY; Robert N. Isseks; Alex Smith, Assistant Corporation Counsel for the City of Middletown, of counsel), for Defendants-Appellees.
 Before: ALTIMARI, PARKER and KEITH*, Circuit Judges.
 KEITH, Circuit Judge:
 
 
 1
 This is a civil rights action by which the plaintiffs assert that defendants, City of Middletown, Mayor Joseph DeStefano, and Alfred Fusco, the Middletown Commissioner of Public Works (collectively the "City"), violated their due process property rights under 42 U.S.C. § 1983, the Fourteenth Amendment's Equal Protection Clause and the Fair Housing Act, 42 U.S.C. § 3601, et seq. ("FHA"). The district court granted the City's motion for summary judgment, holding that a municipality's emergency decision to demolish perceived dangerous buildings could not be "repackaged" as a civil rights action, "when New York provides an adequate post-deprivation remedy." Plaintiffs now appeal that ruling, contending that material issues of genuine fact exist to permit a rational jury to conclude the City violated their civil rights.
 
 I. BACKGROUND
 
 2
 Plaintiff, Stephen Catanzaro, was the owner of two adjacent three-story buildings, which shared a common wall--82 and 84 East Main Street (hereinafter "building No. 82" and "building No. 84") in the City of Middletown, New York. The buildings were late 19th and early 20th century mixed-use, commercial and residential structures. In total, the buildings contained a deli and a bar on the buildings' street level, and eight apartments above. The structures were obsolete in design and lacked many amenities, but nonetheless were useable and common in the urban Middletown community. Middletown is a small Mid-Hudson city with a deteriorating industrial base and a growing minority population.
 
 
 3
 On September 1, 1994, Hyman Wieden drove his automobile from the street, across the sidewalk, into building No. 84.[1] Immediately after the accident, defendant Fusco, in his capacity as Public Works Commissioner, arrived at the scene to inspect building No. 84 for structural damage. Mayor DeStephano arrived shortly thereafter. Fusco concluded that the building was structurally unsound and in imminent danger of collapsing into the street. Despite Catanzaro's objections, Fusco immediately ordered demolition. Thus, the Department of Public Works, using a private contractor, razed building No. 84 the same day. The next day Mayor DeStephano, Fusco and other city officials, including a private consulting engineer, examined the adjoining building No. 82 and determined that the demolition of building No. 84 caused extensive damage to the common wall the buildings shared. Accordingly, the City concluded that the wall required either immediate reconstruction at considerable cost, or immediate demolition of the entire building to avoid its collapse into the street. Fusco discussed these options with Catanzaro, who then signed a consent agreement allowing the City to demolish building No. 82, and the City did so.[2] Mayor DeStefano allegedly laughed and joked during the entire process, calling the demolition "instant urban renewal."
 
 
 4
 On August 31, 1995, the plaintiffs subsequently brought an action against Mayor DeStephano, Commissioner Fusco, and the City of Middletown, claiming that the decision to demolish both buildings was arbitrary and negligent, and that the city's necessity for emergency demolition was a pretextual attempt to rid the City of housing opportunities for the poor and racial minorities.[3] The district court rejected these claims and granted the City's motion for summary judgment on all grounds. This appeal followed.
 
 II. DISCUSSION
 
 5
 On appeal from a grant of summary judgment, we review the record de novo to determine whether any genuine issues of material fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). We reverse a grant of summary judgment if there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact. Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir.1988). A fact is "material" only if the fact has some affect on the outcome of the suit. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. Notwithstanding, courts may not make credibility determinations or weigh the evidence when confronted with a motion for summary judgment. All evidence presented by the nonmoving party must be taken as true, and all inferences must be construed in a light most favorable to the nonmoving party. United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).
 
 A. The Due Process Claims
 
 6
 Catanzaro alleges both procedural and substantive due process violations by the City. Catanzaro's procedural due process argument is that Fusco and Mayor DeStephano, in their official capacities, failed to give him: (1) an opportunity to contest the determination that the building was a threat to public safety; and (2) notice of their intent to destroy his building.
 
 
 7
 Generally, procedural due process requires an opportunity for a meaningful hearing prior to the deprivation of a significant property interest. Parratt v. Taylor, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981). It has long been recognized, however, that authorized agents may proceed without providing pre-deprivation hearings when an emergency situation necessitates quick action or makes it impracticable to provide a meaningful hearing, so long as the State provides "some meaningful means by which to assess the propriety of the State's action at some time after the initial taking...." Id. at 539, 101 S.Ct. at 1914-15.
 
 
 8
 The City contends, under Parratt, that it was within its discretion to conclude building No. 84 was an imminent threat to public safety, and in light of the existing emergency, order its immediate demolition. Catanzaro does not challenge the constitutionality of the City's procedure for demolishing dangerous buildings, but rather, asserts that Commissioner Fusco and Mayor DeStephano improperly declared the existence of an emergency to invoke the Parratt exception.[4]
 
 
 9
 In Burtnieks v. City of New York, 716 F.2d 982, 988 (2d Cir.1983), this court held that the district court could not inquire into the adequacy of a state remedy under the Parratt rule, prior to determining " 'the necessity of quick action' or 'the impracticability of providing any predeprivation process.' " "[T]he existence vel non of an emergency" is an issue of material fact that must be considered. Id. In the instant case, where the plaintiffs contest the existence of the emergency, we would be remiss to uphold a grant of summary judgment. Thus, the grant of summary judgment was improper on this ground.
 
 
 10
 In reaching this conclusion, it is necessary to briefly address the holding from my Circuit, Harris v. City of Akron, 20 F.3d 1396 (6th Cir.1994), to which the City cites in support of its argument. In Harris, the Sixth Circuit held that the demolition of the plaintiff's building without prior notice but pursuant to emergency procedures in the city code did not violate the owner's procedural due process rights. Id. at 1405. The facts of Harris are identical to those of the instant case. A city building inspector made an onsite determination that the plaintiff's building needed to be immediately demolished to avoid its imminent collapse. Id. at 1398. As in the instant case, the owner retained an expert who in an affidavit questioned and criticized the need for immediate demolition of the subject building. Id. at 1398-99. On appeal, the owner contended the affidavit raised a genuine issue of fact warranting a trial with respect to his procedural due process claim. Id. at 1399. The Sixth Circuit disagreed and held:
 
 
 11
 With the authority of the decision makers unchallenged, the question of whether an emergency actually existed constituted nothing more than a question of whether they made the right decision. By attempting to show only that the defendants made the wrong decision, Harris in no sense attacked the constitutionality of the process by which the decision was reached.
 
 
 12
 Harris, 20 F.3d at 1404. The Harris court noted that the determination of whether an emergency existed was completely within the judgment of the building inspector granted under the relevant city ordinance. Id. at 1404. In its opinion, the non-emergency procedure for the predeprivation hearing "would not have removed the threat to public safety and health perceived by the responsible officials." Id. at 1405.
 
 
 13
 To the extent that Harris interprets Parratt to eliminate a plaintiff's opportunity to challenge the arbitrariness of a determination of an emergency at trial, I must find that it was in error. While we recognize that Parratt was based on the conclusion that a risk of harm to the public outweighs the risk of negligent state action, Parratt, 451 U.S. at 538-39, 101 S.Ct. at 1914-15, for summary judgment purposes, precluding such a challenge would deprive the plaintiffs the opportunity to contest a state's decision to abuse their fundamental rights.[5]
 
 
 14
 Catanzaro also contends that the emergency circumstances did not exist during the demolition of building No. 82, and that his subsequent consent was coerced. The record clearly evidenced that building No. 82 was not in any danger of collapsing. Catanzaro merely acquiesced to its destruction because city officials convinced him that he could not afford to repair it. Accepting this evidence as true, and drawing all reasonable inferences in favor of Catanzaro, we believe a reasonable factfinder could conclude that a pre-deprivation hearing was appropriate before the City destroyed this building, and thus summary judgment was inappropriate on this claim as well.
 
 
 15
 Catanzaro further asserts that a reasonable factfinder could conclude that the City arbitrarily destroyed building No. 82 and 84, in violation of his substantive due process rights. "Substantive due process protects [individuals] against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect' or 'ill-advised'." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995). The City argues that its actions were not conscience-shocking or arbitrary, but that it carefully followed the procedures prescribed by the city code upon recognizing an apparent danger. Although the City's claim may have some credence, the Mayor and Commissioner Fusco's state of mind or intent for ordering the destruction of the buildings is not so established that a reasonable jury could not find for the plaintiffs. See Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir.1984) (noting that traditionally a jury resolves questions about a tortfeasor's state of mind). Mayor DeStephano commented during the demolition that the plaintiffs were witnessing "instant urban renewal." Under a favorable light, the Mayor's comment, combined with the peripheral inspection of the building before its destruction, could be taken as the City's predisposition to destroy the buildings in this deteriorating community, regardless of any emergency.[6] Such an arbitrary decision to deprive the residents of their homes, and Catanzaro of two parcels of real estate, would be constitutionally oppressive, sufficient to violate the plaintiffs' substantive due process rights. See Armendariz v. Penman, 31 F.3d 860, 867 (9th Cir.1994) ("[A]ny government action which 'has no substantial relation to the public health, safety, morals, or general welfare' is arbitrary and unreasonable...."). Whether the action actually was or was not oppressive should be determined by the factfinder, but for summary judgment purposes, the issue is not precluded.
 
 B. The Equal Protection Claim
 
 16
 Catanzaro further contends that the City implemented a broad policy to constrict and reduce the supply of housing available to low income members of racial minorities, in violation of the Fourteenth Amendment's Equal Protection Clause. In his argument, Catanzaro correctly recognizes that state "action will not be held unconstitutional solely because it results in a racially disproportionate impact," Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), but in distinguishing his case, Catanzaro provides correlative statistics on the minority population in low-income dwellings, the limited amount of low-income housing approved during Mayor DeStephano's term, as compared to the amount of low-income housing destroyed during the same period. Catanzaro also presents evidence that the Mayor and City officials knew the racial makeup of the Middletown community. Combined with the evidence of the Mayor's "urban renewal" comment, the evidence provides a reasonable inference of a systematic policy of racial discrimination. Consequently, the district court's grant of summary judgment inappropriately precluded the equal protection issue for trial.
 
 C. The Fair Housing Act Claim
 
 17
 As a final challenge, Catanzaro argues that the district court inappropriately granted summary judgment as to whether the City violated the FHA. Section 3604(a) prohibits the state from blocking or impeding the provision of housing based on race. Thus, in contrast to constitutionally discriminatory housing practices, "[h]ousing practices unlawful under [§ 3601 et seq.] include not only those motivated by a racially discriminatory purpose, but also those that disproportionately affect minorities." United States v. Starrett City Assocs., 840 F.2d 1096, 1100 (2d Cir.), cert. denied, 488 U.S. 946, 109 S.Ct. 376, 102 L.Ed.2d 365 (1988). In light of the conflicting evidence regarding the City's policy towards low-income housing and the district court's failure to construe the evidence in favor of the plaintiffs, summary judgment was inappropriate on plaintiff's FHA claim.
 
 D. Governmental Immunity
 
 18
 Alternatively, the defendants assert qualified immunity as an affirmative defense. Generally, public officials are entitled to qualified immunity where their mistaken belief or decision was objectively reasonable. Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523 (1987). The law accommodates an official's reasonable error to encourage decisions without threat of suit. Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984). Notwithstanding, public officials that "knowingly violate the law," are not entitled to the same protection. Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Because there are genuine issues as to whether Mayor DeStephano and Commissioner Fusco knowingly violated the plaintiffs rights, qualified immunity at this point is precluded. Moreover, the City of Middletown is not entitled to immunity, because the Commissioner and Mayor's decisions are sufficient to impute liability to the municipality. See Rookard v. Health and Hosp. Corp., 710 F.2d 41, 45 (2d Cir.1983) (finding that where an official has final authority over matters in which he exercises discretion, the choices he makes reflect municipal policy).
 
 III. CONCLUSION
 
 19
 For the foregoing reasons, we hold that genuine issues of material fact exist as to all claims, that reasonably could be disputed at trial. Accordingly, the district court's grant of summary judgment to the City of Middletown is REVERSED.
 
 PARKER, Circuit Judge, dissenting:
 
 20
 I believe that the district court was correct to grant defendants-appellees City of Middletown (the "City"), Joseph DeStephano, its Mayor, and Alfred Fusco, its Commissioner of Public Works (collectively "Defendants") summary judgment on the civil rights and Fair Housing Act ("FHA") claims brought by plaintiffs-appellants Stephen Catanzaro, Warren Kautz, and Rashon Lal (collectively "Plaintiffs"). Plaintiffs' claims are based on the demolition by the Defendants of two buildings owned by Catanzaro (the "Buildings"), which had been damaged by an automobile accident. Accordingly, I respectfully dissent.
 
 
 21
 Plaintiffs' first claim is based on 42 U.S.C. § 1983, and is that Defendants' actions deprived Plaintiffs of property without due process of law, in violation of the Fifth and Fourteenth Amendments. Plaintiffs make this claim as both a procedural and a substantive due process violation.
 
 
 22
 The analysis of the procedural due process claim begins with Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Parratt holds that although notice and a predeprivation hearing are generally required, in certain circumstances, the lack of such predeprivation process will not offend the constitutional guarantee of due process, provided there is sufficient postdeprivation process. Id. at 538. "[E]ither the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." Id. at 539.
 
 
 23
 The question in this case is whether the Parratt exception applies, and is thus whether there was an emergency, and whether adequate postdeprivation remedies were available. In Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264 (1981), the Supreme Court considered the constitutionality of an emergency procedure which allowed the Secretary of the Interior, acting through government inspectors, to order the immediate cessation of mining activities when an inspector perceived an immediate danger to public safety. The Court held that "[t]he relevant inquiry is not whether a cessation order should have been issued in a particular case, but whether the statutory procedure itself is incapable of affording due process." Id. at 302, 101 S.Ct. at 2374.
 
 
 24
 In finding the procedure constitutional, the Court specifically noted that the procedure afforded the inspectors discretion to determine whether or not there was an emergency, and that this discretion, even coupled with the inherent possibility of its misapplication, did not offend due process: "the possibility of administrative error, inheres in any regulatory program; statutory programs authorizing emergency administrative action prior to a hearing are no exception." Id. The Court then quoted from Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599, 70 S.Ct. 870, 872, 94 L.Ed. 1088 (1950):
 
 
 25
 Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion may be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.
 
 
 26
 Hodel, 452 U.S. at 303, 101 S.Ct. at 2374. The Court did note, however, that this discretion is not absolute, and stated that "if a pattern of abuse and arbitrary action were discernable from review of an agency's administration of a summary procedure," the application of the procedure may be unconstitutional. Id. at 302 n. 46, 101 S.Ct. at 2374 n. 46.
 
 
 27
 Although Plaintiffs in this case do not contest the constitutionality of the emergency demolition procedure invoked by the Defendants in ordering the demolition of the Buildings, and instead question whether that procedure was properly invoked, the application of the principles of Hodel to the Plaintiffs' claim nevertheless must be considered.In determining whether Defendants, in the person of Fusco, properly invoked the emergency procedure, Hodel directs us to accord the decision to invoke the procedure some deference, and not to engage in a hindsight analysis of whether the damage to the Buildings actually created an immediate danger to the public. Under Hodel, the due process guarantee is offended only when an emergency procedure is invoked in an abusive and arbitrary manner; therefore, there is no constitutional violation unless the decision to invoke the emergency procedure amounts to an abuse of the constitutionally afforded discretion.See Hodel, 452 U.S. at 302-03, 101 S.Ct. at 2373-74.[1]
 
 
 28
 The Ninth Circuit has implicitly adopted a similar analysis, and affords some deference to officials charged with making a decision on whether or not to invoke an emergency procedure. See Armendariz v. Penman, 31 F.3d 860, 866 (9th Cir.1994) (holding that the rationale for permitting emergency deprivations does not apply "where the officials know no emergency exists, or where they act with reckless disregard of the actual circumstances"), vacated in part on other grounds, 75 F.3d 1311 (9th Cir.1996) (en banc ). As noted by the majority, the Sixth Circuit has gone even farther, holding, in a case almost factually identical to this one, that where the emergency procedure itself is not challenged on a constitutional basis, the question whether or not the official made the correct decision in invoking that procedure is not of constitutional significance. Harris v. City of Akron, 20 F.3d 1396, 1404-05 (6th Cir.1994).
 
 
 29
 I emphasize that I do not mean to suggest that the government may simply avoid affording due process to citizens by arbitrarily invoking emergency procedures; Hodel clearly declares such actions unconstitutional. Rather, I believe that where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical, the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion.
 
 
 30
 This somewhat deferential standard finds strong support in policy considerations. The law should not discourage officials from taking prompt action to insure the public safety. By subjecting a decision to invoke an emergency procedure to an exacting hindsight analysis, where every mistake, even if made in good faith, becomes a constitutional violation, we encourage delay and thereby potentially increase the public's exposure to dangerous conditions. This quandary is exactly what these emergency procedures are designed to prevent, and is the primary reason they are constitutionally acceptable. If an official believes that the public is in immediate danger, he or she should not hesitate to invoke an emergency procedure for fear of being sued, and being liable for damages should his or her decision turn out to be incorrect in hindsight.
 
 
 31
 Further, I note that if procedural due process violations were to be so broadly defined, in order to avoid the possibility of committing any constitutional violation, an official charged with discretion would be in the anomalous position of almost being forced to hold a hearing to determine whether or not an emergency exists, so as to then determine whether a predeprivation hearing is constitutionally required. This cannot be the proper result.
 
 
 32
 Applying these principles to the facts of this case, I find that Plaintiffs have not alleged sufficient facts from which a reasonable trier of fact could infer that Fusco abused the discretion constitutionally afforded him in invoking the emergency demolition procedure. At the outset, I note that in this case, the event which precipitated the demolition, namely the automobile accident, is in no way attributable to the Defendants. These facts therefore do not implicate the specter of random demolition; the Defendants merely reacted to an incident that was beyond their control, and Plaintiffs can complain only that Defendants' behavior was at most opportunistic. There is, however, insufficient evidence from which a reasonable trier of fact could infer that Defendants opportunistically seized upon the automobile accident as a pretext to destroy the Buildings.
 
 
 33
 The undisputed fact is that the building was severely damaged by the accident. The accident destroyed at least one column that supported the facade of the building, and the facade had developed a significant crack. Additionally, in the words of Plaintiffs, a 12" by 12" header was compromised by the accident. It is also undisputed that Fusco ordered the demolition immediately, and that it began within two hours of the accident.
 
 
 34
 In light of these undisputed facts, and despite the evidence submitted by Plaintiffs, which I assume to be true for purposes of this analysis, that the building was in fact structurally sound, no reasonable trier of fact could find that Fusco acted arbitrarily or otherwise abused his discretion, in deciding to invoke the emergency procedure. The undisputed evidence of the damage to the Buildings provides ample support for a conclusion that Fusco had a reasonable belief that the public was in immediate danger. Further, Plaintiffs provide no additional evidence to support a finding that Fusco's decision was arbitrary, or constituted an abuse of discretion, in determining that the Buildings, in their damaged condition, constituted a danger to the public safety, and needed to be destroyed.[2] I finally note that the Plaintiffs do not contest the adequacy of the postdeprivation remedies which are still available to them. Accordingly, I believe that the district court's grant of summary judgment to the Defendants was proper.
 
 
 35
 I find the majority's reliance on Burtnieks v. City of New York, 716 F.2d 982 (2d Cir.1983), for the proposition that any dispute over whether there is an actual emergency renders summary judgment inappropriate, to be misplaced. In Burtnieks, this Court reversed a grant of summary judgment to the defendants on a procedural due process claim based on demolition of plaintiff's property by the defendants. Id. at 988-89. The property in Burtnieks was slated for demolition for three months, pursuant to a procedure which required notice and a hearing, neither of which plaintiff received. During this time the plaintiff actively sought to prevent the demolition, and arranged for a structural analysis of the property. Nevertheless, the defendants demolished the property without affording the plaintiff a hearing. In seeking to justify their actions, the defendants pointed to a procedure, distinct from the one they had actually proceeded under, which permitted emergency demolition without a hearing. Id. at 984-85.
 
 
 36
 In reversing the grant of summary judgment, this Court noted that the proper application of Parratt involves a two step process, which is consistent with the analysis laid out above. First, a court must find that there was a "necessity of quick action," or an "impracticality of providing any predeprivation process." Id. at 988. Then it must determine whether there are adequate postdeprivation remedies available to the plaintiffs. Id. In applying this two step process, to the facts of Burtnieks, this Court held that the dispute over whether an emergency existed precluded summary judgment for the defendants. Id. In doing so, however, this Court neither implied that any dispute over the existence of an emergency, no matter how minor, would necessarily preclude summary judgment, nor did it provide any standard under which to review a decision to invoke an emergency procedure.
 
 
 37
 The evidence in Burtnieks was such that no reasonable trier of fact could find that an emergency existed, and this Court clearly stated that it could not simply assume the existence of one. This Court explicitly noted that the defendants did not even "claim that it would have been impractical to provide a predeprivation hearing." Id. Even had the defendants claimed that a predeprivation hearing was impractical, the fact the defendants had been planning the demolition for three months, and that they had initially proceeded under a provision which required notice and a hearing, would lead a rational trier of fact to find such claim unconvincing.
 
 
 38
 It thus seems that Burtnieks is properly considered as a case in which it was clear that the defendant in fact knew that no emergency existed, that the invocation of the emergency procedure was therefore arbitrary and abusive, and thus may have constituted a procedural due process violation. I do not read Burtnieks to stand for the proposition that any mistake in invoking an emergency procedure amounts to a constitutional violation, nor can it in light of the general proposition that negligence cannot constitute a constitutional violation. See Daniels, 474 U.S. at 332, 106 S.Ct. at 665-66. I also do not read it to stand for the proposition that an official's decision to invoke an emergency procedure should be subject to something akin to a de novo review.
 
 
 39
 With regard to Plaintiffs' other claims, I again disagree with the majority, and would affirm the district court's grant of summary judgment to the Defendants on each such claim. To succeed on their substantive due process claim, Plaintiffs must show that the government action was "arbitrary, conscience-shocking, or oppressive in a constitutional sense," and not merely " 'incorrect or ill-advised.' " Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995) (citations omitted).
 
 
 40
 As noted above, Plaintiffs presented absolutely no evidence which suggests that Defendants actions were anything worse than incorrect or ill-advised. There is nothing to suggest that Defendants did anything more than order the demolition of the Buildings, which had been severely damaged by an automobile accident, in order to protect the public safety. Absent some evidence of a culpable state of mind on the part of Defendants, and Fusco (who actually made the demolition decision) in particular, which Plaintiffs do not provide, no reasonable trier of fact could find this demolition to be arbitrary, conscience-shocking or otherwise constitutionally oppressive.
 
 
 41
 I believe that the district court also properly granted Defendants summary judgment on Plaintiffs' equal protection and FHA claims. To prevail on an equal protection claim, "[p]roof of racially discriminatory intent or purpose is required." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 562-63, 50 L.Ed.2d 450 (1977). Plaintiffs have presented no evidence to prove such racial animus;[3] their argument merely piles one inference upon the next in seeking to construct some logical framework from which one might be able infer that the Defendants may harbor some racial animus.
 
 
 42
 In analyzing Plaintiffs' evidence, I note initially that there is no evidence suggesting that the Defendants, and Fusco in particular, even knew the racial makeup of the tenancy of the Buildings prior to the demolition. There is, however, substantial and uncontradicted census data in the record indicating that low income whites substantially outnumbered low income African Americans, Hispanics and other minorities in the area in which the Buildings were located. However, even assuming it to be true that minorities disproportionately inhabit buildings such as those destroyed, there is no evidence to suggest that Defendants actually knew this fact themselves, and therefore this fact does not make reasonable an inference that Defendants knew the demolition would disproportionately affect minorities.
 
 
 43
 Even if Plaintiffs did show that a reasonable trier of fact could find that Defendants knew the racial makeup of the tenancy of the Buildings, this fact alone would not be enough under Arlington Heights, which requires not merely disparate impact, but proof of racially discriminatory intent. Id. The "context" of the demolition, upon which Plaintiffs seek to rely, does not supply this proof. The context consists of conclusory allegations, supported by anecdotal evidence, that the City and its Mayor, DeStephano, maintained housing policies which might have a disproportionately adverse impact on minorities. This does not meet the standard of Arlington Heights. First, Fusco, who made the demolition decision, is not in any way tied to the allegedly discriminatory policies. Furthermore, there is no evidence of actual racially discriminatory intent in either the housing policies or in the demolition, and the context evidence does not amount to a "clear pattern, unexplainable on grounds other than race," which would excuse such a showing. Id. at 266. This type of conclusory allegation of discriminatory impact in DeStephano's approach to the City's housing programs simply cannot convert the decision to demolish two buildings into an equal protection violation.
 
 
 44
 Although it is true that the FHA claim does not require proof of discriminatory intent, see Orange Lake Assocs., Inc. v. Kirkpatrick, 21 F.3d 1214, 1227 (2d Cir.1994), Plaintiffs' FHA claim fails for similar reasons. To make out an FHA claim, Plaintiffs must allege an action which has a discriminatory effect, either through an "adverse impact on a particular minority group," or through "harm to the community generally by the perpetuation of segregation." Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 937 (2d Cir.1988).
 
 
 45
 I disagree with the majority's statement that "[c]onstruing the evidence favorably to the plaintiffs, clearly the City's policy for providing low income housing violates the FHA." Ante at 93. The Plaintiffs here are not challenging the overall housing policy of the city, they are merely challenging the demolition of the Buildings. As noted above, Plaintiffs have failed to provide sufficient evidence from which it can be reasonably inferred that Defendant's housing policies have a discriminatory effect, much less that the demolition of two buildings which had been damaged in an automobile accident constituted a part of such a discriminatory policy.
 
 
 46
 Accordingly, I respectfully dissent.
 
 
 
 *
 Honorable Damon J. Keith, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 [1]
 Wieden was originally named as a defendant in this action, but was dismissed because he was not a state actor for purposes of the fourteenth amendment and civil rights claims
 
 
 [2]
 Catanzaro now alleges his consent was coerced
 
 
 [3]
 The additional plaintiffs include: Rashon Lal, Robert Merino, Delores Merino, Levana Dumenigo, Rose Rivera, and Sergio Rivera, as tenants of buildings No. 82-84, seeking to recover personal property and damages for interference with their right of possession. Plaintiff Warren Kautz, since deceased, as the owner of the adjacent building at 80 E. Main Street, also joins seeking damages for harm done to his adjoining building in the course of the demolition work. For the remainder of this discussion all plaintiffs will collectively be referred to as "Catanzaro."
 
 
 [4]
 Catanzaro acknowledges the fact that the Middletown Building Code gives the Commissioner of Public Works full authority to order immediate destruction of dangerous structures posing imminent threat to the public. Appellant's Brief, p. 21
 
 
 [5]
 Contrary to the dissent's contention, our holding does not imply that every discretionary determination by state officials must be challenged at the caprice of disgruntled plaintiffs. Under the circumstances, however, where there is evidence of the City's ardor to rebuild this depreciating community regardless of the existence of an emergency, the Plaintiffs at least have a right to assert at trial that the Defendants opportunistically abused their discretion, notwithstanding their chances of success
 
 
 [6]
 The Defendants contend that Mayor DeStephano's comments cannot support any inferences of predisposition by City officials, because Fusco, in his capacity as Public Works Commissioner, independent of Mayor DeStephano, held sole authority to order the demolition of the buildings. We are not persuaded by their assumption, and note that despite his independence, Fusco made no decision to demolish building No. 84 until after Mayor DeStephano arrived on the scene. Plaintiffs further explain that it was Mayor DeStephano that told Catanzaro "the building would fall down," and refused his requests to support the facade of building No. 84 with lolly columns. Appellant's Brief, p. 4. Viewed in a light most favorable to the Plaintiffs, we believe Mayor DeStephano was actively involved in Fusco's decision to demolish the buildings
 
 
 [1]
 This principle is consistent with the general proposition that mere negligence can not constitute a due process violation. See Daniels v. Williams, 474 U.S. 327, 332, 106 S.Ct. 662, 665 (1986) (noting that to hold that negligence could amount to a constitutional violation "would trivialize the centuries-old principle of due process of law")
 
 
 [2]
 As discussed below, I believe that Plaintiffs have failed to supply sufficient evidence from which a reasonable trier of fact could infer from Defendants' housing policies that they bore any racial animus. Even if Plaintiffs had shown such, to prevent summary judgment on the procedural due process claim, they would have to show some racial animus on the part of Fusco individually, as he was vested with the sole discretion to order the emergency demolition. Plaintiffs have failed to even make such an allegation
 
 
 [3]
 DeStephano's "instant urban renewal" comment is not sufficient. The emergency procedure vests discretion in Fusco, and DeStephano's's comment, even if considered evidence of racial animus, is not indicative of Fusco's intent