**Khaled KASSIM, Plaintiff,**

v.

**The CITY OF SCHENECTADY; and Michael T. Brockbank, Defendants.**

No. 02–CV–186.

United States District Court, N.D. New York.

April 3, 2003.

**34**

Duncan and Duncan, Albany, NY (E. David Duncan, Esq., of Counsel), for Plaintiff.

Friedman, Hirschen, Miller & Campito, P.C., Schenectady, NY (John L. Orfan, Esq., of Counsel), for Defendants.

### *MEMORANDUM–DECISION and ORDER*

HURD, District Judge.

### I. *INTRODUCTION*

Plaintiff Khaled Kassim ("plaintiff"), pursuant to 42 U.S.C. § 1983, brought suit against defendants City of Schenectady ("the city" or "defendants") and Michael T. Brockbank ("Brockbank" or "defendants"), alleging that defendants' seizure of his business and property on April 23, 2001, violated the procedural due process clause of the Fourteenth Amendment of the Constitution.

Both plaintiff and defendants filed motions for summary judgment pursuant to Fed.R.Civ.P. 56; plaintiff for partial summary judgment on the issue of liability, and the defendants for summary judgment dismissing the complaint. Oral argument was heard on February 28, 2003, in Albany, New York. Decision was reserved.

### II. *FACTS*

In 1998, plaintiff operated Victory Market, a convenience store, on premises located at 605 Craig Street in Schenectady, New York. The premises were owned by Atif Hagel–Khidir, who leased space to plaintiff as a tenant pursuant to a five-year lease beginning June 1, 1998, and ending May 31, 2003. The lease was signed by both parties, and was notarized but never recorded. The owner was living in California, and was responsible for paying the property taxes.

The owner was delinquent in paying the property taxes in the amount of $11,827.78.

(Docket No. 16, Exh. C). As a result, the city filed a petition for foreclosure on the property. On September 22, 2000, a copy of the petition and notice of foreclosure upon the property was placed on a bulletin board in the main lobby of the Schenectady County Courthouse, and in the Office of the Director of Finance for the city. The persons personally served with notice of the foreclosure proceedings, according to Brockbank, are "owners and lienors and *any other persons who have an interest in the property that we know of or can find.*" (Docket No. 19, Exh. 3, p. 11, lines 19–21) (emphasis added). Despite Brockbank's admission that he had been aware of the Victory Market for up to two years prior to April 23, 2001, plaintiff himself was never mailed the copy of the petition and notice of foreclosure. The only person personally served by mail with copies of the petition and notice of foreclosure proceedings was the owner in California. Defendants also claim copies of the petition and notice of foreclosure were published in the Schenectady Daily Gazette, a newspaper of large circulation in the city.

A default judgment of foreclosure dated April 7, 2001, was entered in favor of the city on the premises at 605 Craig Street, awarding the city possession thereto. The judgment further ordered the Director of Finance for the city to execute and record a deed to the property, conveying title to the city in fee simple absolute. On April 16, 2001, said deed was delivered to the city, but was not recorded until April 24, 2001.

On April 23, 2001, Brockbank, who was and is Corporation Counsel for the city, along with a city carpenter, an individual from the city's Department of Development, and some police officers, arrived at 605 Craig Street for the purpose of evicting plaintiff from the premises. Richard Voris ("Voris"), who at the time worked as a Property Management Aide for the city's Bureau of Neighborhood Revitalization ("BNR"), was called to meet Brockbank at the premises with a notice to vacate. Brockbank testified that it is BNR's decision, not his, as to whether to seize a foreclosed property, and that he is asked to accompany them to seizures only in unusual situations or where more explanation to the occupants of the properties is required. (Docket No. 19, Exh. 3, p. 31, lines 1–7; p. 20, lines 1–7). On the other hand, Voris' deposition testimony indicates that BNR is mainly responsible for posting notice to vacate forms on the doors of foreclosed properties, preparing the properties for resale, and to assist and follow the orders of Corporation Counsel in accomplishing evictions. (Docket No. 16, Exh. H, p. 7, lines 16–20; p. 18, lines 5–7) Further, according to Voris, he was at 605 Craig Street for only approximately six minutes, while Brockbank was apparently there for around an hour. (*Id.*, Exh. H at p. 17, line 15; Docket No. 19, Exh. 3, p. 17, lines 12–14 (noting that conversation with plaintiff took approximately 45 minutes)).

Voris went to the premises, carrying with him a standard notice to vacate form in which blanks for dates and an address were simply to be filled in. Brockbank told Voris to fill out the form with the necessary information and post it on the door of the premises. The form, dated "4/23/01" and signed at the bottom by Voris, read as follows:

> This property located at *605 Craig Street* is now owned by the City of Schenectady, through Tax Foreclosure. On *4/23/01* at 8am this property is scheduled to be winterized and secured (boarded-up), and the utilities will be shut off. It is unlawful to reside within the property. All persons and their belongings must be removed from the property on or before *4/23/01*. If you have any questions, do not hesitate to contact met at: [phone number omitted].

(Docket No. 16, Exh. E) (underlined portions represent filled in information). One copy of the notice to vacate was posted on the door of the premises, and another was placed in one of Voris' files. This was the first and only notice plaintiff received to vacate the premises, or of the then-concluded foreclosure proceedings. Brockbank, despite being aware of the Victory Market, admits that he made no inquiries as to who owned the store, and claims he was unaware that the premises had a tenant.

According to both Voris and Brockbank, it was custom and practice of the city to provide the notice to vacate to tenants in advance of the seizure of the premises by the city. How much advance notice is given, according to Brockbank, depends on the circumstances. Voris claims that if the properties are occupied, the usual practice is to give the occupants thirty days to vacate. Brockbank, however, who admits that the entire foreclosure process is under his supervision and control, indicated that advance notice of "up to 30 days, sometimes as little as 3 days" is given, but acknowledged that sometimes no advance notice is given, citing one occasion where a building was declared unsafe. (Docket No. 19, Exh. 3, p. 25, lines 14–15). When asked why no advance notice was given to plaintiff, Brockbank responded, "Victory was known to the city to be a difficulty with respect to activities in and around the building from a police point of view. That is, drug sales, commotions, difficulties and problems with policing with respect to that address, namely the Victory Market." (Docket No. 19, Exh. 3, p. 29, lines 17–22).

Brockbank entered the premises and explained to plaintiff and others in plaintiff's employ that the property had been foreclosed for tax delinquency, and that they needed to immediately vacate. It is unclear exactly who accompanied him inside. According to Brockbank, Voris and another BNR employee accompanied him. According to Voris, he never went inside the premises that day. According to one of plaintiff's employees, Marcia Parker, Brockbank, three police officers, Voris, and a cameraman entered the store. However, it is unclear how many remained inside during the time Brockbank was explaining the events to plaintiff. Pad locks were placed on the doors of the Victory Market by city employees.

After a short while, plaintiff left the premises with some cash, some lottery tickets, and some cigarettes. He was told he had thirty days to remove the remainder of his property. Plaintiff claims that he was able to gain access to the premises on some occasions and retrieve some property, but that on other occasions, he was denied access because no one from the city could or would come out and unlock the pad locks. Plaintiff claims he was not given an extension on the thirty-day deadline. As a result, plaintiff claims he was unable to retrieve several items of inventory, equipment, and/or other property within the thirty-day time frame, and that his business was ultimately destroyed.

As noted above, the day after the April 23, 2001, seizure of the premises, the deed delivered to the city on April 16, 2001, was recorded. It is Brockbank's understanding that upon such recording, the city held legal title to the property. Prior to the recording, he claims the city held only equitable title to the property.

On July 5, 2001, plaintiff served a Notice of Claim on the city. The city never responded, and the instant lawsuit followed on February 12, 2002.

### III.  *DISCUSSION*

#### A.  *Summary Judgment Standard*

Both plaintiff and defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56. Under that rule, sum-

mary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 436 (2d Cir. 1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

### B. *Procedural Due Process*

█ Pursuant to 42 U.S.C. § 1983, plaintiff is claiming that defendants' conduct—in failing to provide him with notice and opportunity to be heard—violates the procedural due process clause of the Fourteenth Amendment. "To prevail on this claim, the plaintiff must show [1] that [he] 'possessed a protected liberty or property interest, and [2] that he was deprived of that interest without due process of law.'" *McMenemy v. City of Rochester,* 241 F.3d 279, 285–86 (2d Cir.2001) (quoting *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.) (per curiam), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998)). As there is no dispute here that plaintiff had a protected interest, only the second requirement will be discussed.

█ To determine which procedural protections the Constitution requires in a particular case, three factors must be weighed: (1) the private interest affected by the government action; (2) the risk of an erroneous deprivation of the interest through the procedures used by the government and the value, if any, of additional or different procedural safeguards; and (3) the government interest, including the particular function involved and the financial and administrative burdens that would be imposed if the additional or different procedural safeguards were adopted. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Kia P. v. McIntyre,* 235 F.3d 749, 759 (2d Cir.2000). As a general rule, courts usually hold that the Constitution, as embodied in these factors, requires notice and opportunity to be heard prior to the deprivation of the protected interest, i.e., pre-deprivation process. *See Fuentes v. Shevin,* 407 U.S. 67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Catanzaro v. Weiden,* 140 F.3d 91, 94 (2d Cir.1998). However, in determining if pre-deprivation process is appropriate, "the Supreme Court has distinguished between claims based on established state procedures and claims based on random, unauthorized acts by state employees." *Hellenic American Neighborhood Action Committee v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996) (citing *Hudson v.*

*Palmer*, 468 U.S. 517, 532, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).

■ "In the latter case, the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post-deprivation hearing." *Hellenic*, 101 F.3d at 880; *see also Hudson*, 468 U.S. at 533, 104 S.Ct. 3194; *Parratt*, 451 U.S. at 538, 101 S.Ct. 1908. The prevailing rationale for this rule derives from the theory that, because the deprivations are "random" and "unauthorized," pre-deprivation process is impracticable as the state cannot anticipate or know when such deprivations will occur. *Hudson*, 468 U.S. at 533, 104 S.Ct. 3194; *see also Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (stating that post-deprivation process may satisfy due process "where a State must act quickly, or where it would be impractical to provide pre-deprivation process"). Thus, deprivation of an interest without prior process is permissible only in "extraordinary situations." *Fuentes*, 407 U.S. at 90, 92 S.Ct. 1983; *see also United States v. All Assets of State-wide Auto Parts*, 971 F.2d 896, 903 (2d Cir.1992) ("very prompt action [must be] necessary").

Plaintiff argues that the due process challenge is not directed towards random and unauthorized acts, but instead flows from the city procedure, established and effectuated by Brockbank, of exercising discretion in deciding how much, if any, advance notice is given for evictions. He further argues that no emergency or impracticality existed that would counsel against giving him pre-deprivation process. Defendants argue that Brockbank's actions were random and unauthorized and, consequently, that the availability of post-deprivation process, in the form of state law landlord-tenant provisions, provides a complete defense to plaintiff's § 1983 claim.

### 1. *Random and unauthorized acts or established state procedure?*

■ First, inquiry into and analysis of the post-deprivation procedures and processes is largely relevant only when the subject acts are "random and unauthorized," and not accomplished pursuant to established state procedure. *See Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir.1999) ("*Hudson* and *Parratt* apply only where the deprivation complained of is 'random and unauthorized'") (quoting *Alexandre v. Cortes*, 140 F.3d 406, 411 (2d Cir.1998)); *Butler v. Castro*, 896 F.2d 698, 700 (2d Cir.1990). Regardless of whether there is a policy in place, one may be inclined to view Brockbank's decision to give no advance notice to plaintiff a random and unauthorized act, as those terms are ordinarily understood in common vernacular.

However, the Second Circuit has made clear that the words, as used in *Hudson* and *Parratt*, are not to be defined and used in the ordinary sense. *See Patterson v. Coughlin*, 761 F.2d 886, 892 (2d Cir. 1985) ("[A]lthough the denial of due process may have been 'unauthorized,' the deprivation of liberty here does not appear to be have been 'unauthorized' as that term is meant by *Parratt*"). Instead, for purposes of classifying depriving state conduct, "the Second Circuit has drawn a sharp distinction between the random and unauthorized acts of lower-echelon employees and the acts of high-ranking officials," *Clow v. Deily*, 953 F.Supp. 446, 452–53 (N.D.N.Y.1997) (internal quotations and citations omitted), holding that depriving acts are not random or unauthorized with-

in the meaning of *Hudson* and *Parratt* if such acts were undertaken by "high-ranking officials having final authority over the decision-making process." *Dwyer v. Regan*, 777 F.2d 825, 833 (2d Cir.1985); *see also RR Village Assn. v. Denver Sewer Corp.*, 826 F.2d 1197, 1204 (2d Cir.1987).

■ Thus, the question becomes whether Brockbank is a high-ranking official with final authority over the foreclosure and/or eviction process at issue in this case. This question, as a matter of law, must be answered in the affirmative. Brockbank is Corporation Counsel for the city. He was appointed specifically by the mayor. He admits that he oversees the entire foreclosure process. He admits that he was at the subject premises, that it was he who explained to plaintiff what was occurring, and that he told Voris the dates to fill in on the notice to vacate, and to post it on the door. He admits that he was unaware of any prior notices to vacate issued to plaintiff, and no witness can or has even attempted to rebut plaintiff's contention that he received none.

Brockbank attempts to defer responsibility for the eviction process to Voris and BNR. However, it is clear that it is they who follow his orders, and that their main responsibility—to clean, repair, and prepare properties for resale—comes after the actual eviction. Indeed, BNR's only real, tangible responsibility with regard to the act of evicting seems to be to post a notice to vacate on the premises. Even this act, on this occasion, was performed at the behest of Brockbank. Voris was called and told to go to the premises. He proceeded there with a blank notice to vacate form, and filled in the blanks on Brockbank's orders. Clearly, Brockbank had the requisite final authority over the decision as to how much notice, if any, was to be given to plaintiff. Thus, his actions were not random and unauthorized within the meaning of *Hudson* and *Parratt*, and

instead amount to an established state procedure of using his discretion to determine how much, if any, advance notice is to be given. As such, barring impracticality or emergency circumstances, plaintiff was entitled to pre-deprivation process.

### 2. *Impracticality or emergency circumstances*

■ Second, no impracticality or emergency circumstances existed here that would excuse Brockbank from giving pre-deprivation process to plaintiff. He attempted to justify the same-day notice by referring to the alleged criminal activities and policing problems that plagued the premises. Initially, it is noted that if this were true, or verifiable, courses of action other than rather long civil tax foreclosure proceedings would seem to best serve the city and its inhabitants. If, as Brockbank testified, drug activities were occurring on the premises, one sees little reason—indeed, no reason—why the appropriate criminal authorities were not notified and the danger immediately remedied, rather than permitting it to occur for a full two years. Even if Brockbank had no authority to institute such investigations and proceedings, it is hoped that he would at least notify someone who had such authority.

In any event, the mere suspicion of sporadic criminal activity is certainly not an emergency situation that would justify dispensing with plaintiff's constitutional rights. This is not to say that criminal activity can never be a reason for immediately ejecting people from premises and taking control of the property therein. Such situations routinely occur in the criminal context. Here, however, there were no special circumstances requiring swift action. At the time of the seizure, there were no criminal charges pending nor any criminal activity in the store. If the policing problems and criminal activities were

indeed the catalyst for the seizure without any process, then it makes little sense that over two weeks elapsed from the date of the judgment to the date of the seizure. Immediate seizure would likely have occurred. Defendants will not be permitted to classify the situation as an emergency in order to condone the legality of their actions. It was either an emergency or it was not an emergency. No evidence has been put forward that at the time of the seizure any emergency circumstances, criminal activity, or policing problems, existed. In short, defendants' conclusory allegations that emergency circumstances existed so as to excuse defendants from providing pre-deprivation process to plaintiff is rejected.

### 3. *Adequacy of notice given to plaintiff*

■■■ Since plaintiff was entitled to pre-deprivation notice, it must next be determined whether the notice given to plaintiff—same-day notice that plaintiff had to leave the premises—satisfied due process requirements. "At a minimum, due process requires that the government provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Weinstein v. Albright*, 261 F.3d 127, 134 (2d Cir.2001) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). The focus of the process adequacy inquiry is whether the government acted reasonably in selecting the means likely to inform interested parties, and not necessarily on whether interested persons actually receive notice. *Weinstein*, 261 F.3d at 135 n. 7 (quoting *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir.1988)). The means selected need not eliminate " 'all risk of nonreceipt,' " as " '[n]ow and then an extraordinary case may turn up, but constitutional

law like other mortal contrivances has to take some chances, and in the great majority of instances no doubt justice will be done.' " *Weigner*, 852 F.2d at 649–50 (quoting *Mullane*, 339 U.S. at 319, 70 S.Ct. 652 (quoting *Blinn v. Nelson*, 222 U.S. 1, 7, 32 S.Ct. 1, 56 L.Ed. 65 (1911)), and citing *Schroeder v. City of New York*, 371 U.S. 208, 214, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962)).

■■■ Initially, it is noted that the process to which plaintiff was entitled—pre-deprivation notice—was absent in this case. The notice was *simultaneous* with the deprivation, and is therefore on its face inadequate and violative of plaintiff's procedural due process rights. Even if that undeniable fact is ignored, and the means selected to afford plaintiff notice are analyzed independently as to their reasonableness and conformity with due process, it must be found, as a matter of law, that plaintiff's procedural due process rights were still violated.

■■■ The means selected to afford plaintiff notice—the posting of the notice to vacate on the same day plaintiff was required to vacate—were wholly inadequate. Brockbank sent the notice of foreclosure to the owner of the premises in Anaheim, California, but he knew that the Victory Market was being operated in Schenectady, New York. He had been aware of alleged "problems" in and around the Victory Market for up to two years prior to the seizure. Ordinary common sense and decency mandate that a determination be made as to whether the owner of the building and the operator of the store within are one and the same. If, as Brockbank claims, particular and longstanding problems with the store were apparent, it stands to reason that he may also have known that the two were not one and the same. Even if he did not so know, reasonableness requires that the possibili-

ty at least be investigated. Brockbank admits no such effort was undertaken, despite Voris' statement that the first step in the eviction process is to determine if the foreclosed premises are occupied, and despite Brockbank's own statement that notice is served on any interested person.

Notice to vacate was served on plaintiff not only on the same day on which the notice mandated he vacate the premises with his property, but at the *same time*. The Corporation Counsel had police officers with him to assure that the plaintiff immediately vacated the premises. This is clearly inadequate. Nothing prevented Brockbank from notifying plaintiff before the seizure, and nothing prevented him from making the notice effective at a later date. His actions were clearly, patently, blatantly, and unjustifiably unreasonable, and because he was a high-ranking official within the city in charge of the discretionary decision on how much notice to give, his conduct will be attributed to the city.

The means used to notify plaintiff of the foreclosure proceedings—i.e., posting copies of the petition and notice of foreclosure in the Schenectady County Courthouse, the office of the Director of Finance, and in a local newspaper—were not reasonable and adequate to put plaintiff on notice that he was to be evicted on April 23, 2001. The mere notice of the initiation of foreclosure proceedings does not excuse giving notice of the result of those proceedings— the eviction. In many cases, like this one, a person owns a building but has tenants. Having notice of the foreclosure proceedings, in short, is irrelevant to plaintiff/tenant and his protected interests.

Regardless, under the circumstances, even assuming that notice of the foreclosure proceedings sufficed to put plaintiff on notice of the eviction, or the possibility thereof, the means used were not reasonable. Brockbank was aware of the Victory Market. He was aware that the owner lived in California. While it is certainly possible that one may simply believe the property owner is also the owner of all commercial establishments therein, reasonableness commands that the same be investigated. The investigation would not be a particularly difficult task, and given the likelihood that a person's constitutionally protected interest was about to be taken away, it is hoped that it is an important one. The investigation would quickly have revealed that plaintiff was a tenant in possession. Despite these facts, Brockbank never gave plaintiff notice to vacate until *minutes* before he was actually evicted by uniformed police officers. Therefore, even assuming that notice of the foreclosure proceedings automatically translates into notice of the possibility of eviction, plaintiff's procedural due process rights were still violated.

### 4. *Qualified Immunity*

Defendants, in their moving papers, also assert on Brockbank's behalf the defense of qualified immunity for his actions. (*See* Defendants' Memorandum of Law, Docket No. 17). This defense, however, was not raised in defendants' March 6, 2002 answer to plaintiff's complaint. (*See* Answer, Docket No. 2). It was instead raised in the form of "a brief statement on the record" just prior to the deposition questioning of plaintiff on September 25, 2002. (*See* Docket No. 19, Exh. I, p. 4, lines 4–20). This practice, of asserting a new defense over six months after filing a responsive pleading, will not be condoned or permitted. The defense of qualified immunity, not properly raised in defendants' answer, is considered waived and unavailable.

### IV. CONCLUSION

Plaintiff's procedural due process rights were not only violated by the conduct of

Brockbank and the city, they were determined by the defendants to be non-existent. Such a determination, barring emergency circumstances clearly not present here, will not be permitted to stand without proper accountability.

Plaintiff's motion for partial summary judgment on the issue of liability must be granted. Defendants' motion for summary judgment must be denied.

Accordingly, it is

ORDERED that

1. Plaintiff Khaled Kassim's motion for partial summary judgment on the issue of liability is GRANTED;

2. Defendants, City of Schenectady and Michael T. Brockbank's, motion for summary judgment is DENIED;

3. A jury trial on compensatory or nominal, and/or punitive damages will be scheduled.

IT IS SO ORDERED.