**ISOGON CORPORATION, Plaintiff,**

v.

**AMDAHL CORPORATION, Defendant.**

**No. 97 CIV. 6219(SAS).**

United States District Court,
S.D. New York.

Nov. 19, 1998.

---

OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. *Introduction*

Plaintiff Isogon Corporation ("Isogon") brought suit against defendant Amdahl Corporation ("Amdahl") alleging infringement of certain patents relating to its "SoftAudit" product[1] (U.S. Pat. Nos. 5,499,340 and 5,590,056). Amdahl now moves for summary judgment pursuant to Fed. R.Civ.P. 56 on the ground that the patents are invalid under 35 U.S.C. § 102(b). In support of its motion, Amdahl contends that Isogon sold or offered to sell its invention to Aetna Life Insurance Co. ("Aetna") and GIS Information Systems ("GIS") in October 1992, approximately three months prior to the January 12, 1993 statutory bar date.[2] Because I find that material issues of fact exist with regard to the commercialization, the substantial completeness, and the experimentation of SoftAudit vis-a-vis Aetna and GIS, defendant's motion for summary judgment is denied.

## II. *Discussion*

### A. *Standard for Summary Judgment*

█ Summary judgment is inappropriate unless "the pleadings, depositions, answers to interrogatories, and admissions of

Max Moskowitz, Ostrolenk, Faber, Gerb & Soffen, LLP, New York, NY, for Plaintiff.

Robert T. Tobin, Kenyon & Kenyon, New York, NY, for Defendant.

1. SoftAudit is essentially an amalgam of four basic software components. The first component, the "surveyor," is a software program "capable of combing through computer program files stored on a main frame computer to create an *inventory* list of all of the stored programs" expressed by their commercial product names. *See* Declaration of Robert Barritz, inventor of the patents in suit and president of Isogon, sworn to August 28, 1998 (the "Barritz Decl."), ¶ 6. Another major component is the "monitor" consisting of "software that is capable of insinuating itself into the OS (operating system) of the computer being monitored, to monitor and track the usage of various computer programs within the computer." *Id.* at ¶ 7. The third component is the "reporter" which "produces reports that allow individuals to determine the meaning and implication of the results pro- duced by the surveying and monitoring components." *Id.* at ¶ 8. The fourth component is the "knowledge base" which is a database containing information about thousands of different file names used by different computer programs and a correlation of those files names with the corresponding commercial product names associated with each. *Id.* at ¶ 9. According to Mr. Barritz, "[w]ithout the knowledge base, the invention is useless." *Id.*

2. Isogon filed its patent application on January 14, 1994. According to 35 U.S.C. § 102(b), an inventor is barred from receiving a patent if there was an offer to sell the patented invention more than one year prior to the filing date of the patent application. Thus, January 12, 1993 is the critical date from which any § 102(b) bar is measured.

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is as available in patent cases as in any other area of litigation. *Chore–Time Equipment, Inc. v. Cumberland Corp.,* 713 F.2d 774, 778–79 (Fed.Cir. 1983).

On a motion for summary judgement, the moving party has the burden of showing the absence of a genuine issue of material fact, *i.e.,* a fact that might affect the outcome of the suit. *Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A district court must discern whether there are any such issues but not decide them. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir. 1994). In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved and all reasonable inferences drawn in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. at 255, 106 S.Ct. 2505; *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d 1270, 1274 (Fed.Cir.1995). Summary judgment is inappropriate if there is any evidence in the record from which a jury could draw a reasonable inference in favor of the nonmoving party on a material fact. *Catanzaro,* 140 F.3d at 93.

### B. *Commercialization*

 To invalidate a patent under 35 U.S.C. § 102(b), the party asserting the on sale bar must demonstrate by clear and convincing evidence "that there was a defi-

nite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *UMC Elec. Co. v. United States,* 816 F.2d 647, 656 (Fed.Cir. 1987). As explained in *Ferag AG v. Quipp Inc.,* 45 F.3d 1562 (Fed.Cir.1995):

> While a wide variety of factors may influence the on sale determination, no single one controls the application of section 102(b), for the ultimate conclusion depends on the totality of the circumstances. The underlying policies are what drives the section 102(b) analysis. Foremost among these is the policy of preventing inventors from exploiting the commercial value of their inventions while deferring the beginning of the statutory term.[3] To this end, the inventor is strictly held to the requirement that he file his patent application within one year of any attempt to commercialize the invention.

*Id.* at 1566 (internal citations omitted, footnote added). Whether the inventor placed his invention on sale is an objective test that "at its heart lies the inventor's attempt to commercialize the invention." *Id.* at 1568.

On July 10, 1992, Isogon's President Robert Barritz wrote to Aetna:

> Isogon is currently developing a software product, presently called SoftAudit...
>
> We would be interested in securing the cooperation of Aetna during the remainder of the development process. It would be helpful to us to use Aetna's SMF data to test SoftAudit... It would also be useful to us to use Aetna as a beta-test site for SoftAudit.

---

**3.** Other policies include: discouraging the removal of inventions from the public which justifiably comes to believe are freely available as a result of prolonged sales activity; encouraging prompt and widespread disclosure of new inventions to the public; and giving the inventor a reasonable amount of time following sales activity to determine if a patent is worthwhile. *General Electric Co. v. United States,* 228 Ct.Cl. 192, 654 F.2d 55, 61 (Ct.Cl.1981).

If Aetna and Isogon reach agreement on this within the next few weeks, we'll expect to be able to deliver a preliminary, but functional, version of SoftAudit by mid-October.

Barritz Decl., Exh. D.

■ Effective October 12, 1992, Isogon entered into an agreement with Aetna (the "Agreement") which granted Aetna a license to use the SoftAudit product. *See* Exhibit A to Memorandum in Support of Defendant Amdahl Corporation's Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 102(b) ("Amdahl Memo."). Isogon entered this Agreement "intending to be legally bound" by its terms. *Id.* at 1. The Agreement provides that "Isogon sells and grants to Aetna a perpetual, worldwide, nonexclusive license to use" SoftAudit and its supporting documentation. *Id.* at 2. Schedule No. 1 to the Agreement provides for a one-time license fee of $3,000 and an annual maintenance service fee of $1,000 per year for the use of SoftAudit. *Id.* at 10. Schedule No. 1 further provides that Aetna is in possession of "certain information regarding the names of the load modules comprising certain computer software products (the "Product Data")" which it agrees to provide to Isogon in exchange for a "preliminary, beta-test version of SoftAudit as well as associated preliminary documentation for Aetna's testing and approval." *Id.* at 11.

Mr. Barritz claims that Aetna insisted that Isogon execute Aetna's form agreement for software purchasing transactions which he did as he was anxious to obtain Aetna's cooperation. Barritz Decl., ¶ 17. According to Mr. Barritz:

It was clear to all that Aetna was not receiving a product that was guaranteed to work. In fact, in October 1992, the knowledge base was so barely populated with product information that the software was commercially useless, including to Aetna. It could not be delivered to bona-fide customers, not even for beta

testing. It was merely in a form ready to be field tested.

*Id.*

To this day, Aetna has not paid the $3,000 consideration recited in the October 1992 Agreement. Barritz Decl., ¶ 20. SoftAudit currently commands a market price in excess of $20,000 and the largest single fee for a single computer installation was $1.8 million dollars. *Id.* at ¶ 23. In 1995, Isogon agreed to deliver SoftAudit to Aetna on payment of only the $1,000 yearly maintenance fees. *See* Declaration of Tom Martin, an Isogon sales employee, sworn to August 27, 1998, ¶¶ 3, 11 ("Martin Decl."). Isogon agreed to this in part because it wanted to use Aetna as a reference for potential SoftAudit customers and in part because it wanted to sell Aetna different software products. *Id.* at ¶ 3.

There is some evidence that the 1992 Agreement with Aetna was not a sale made on ordinary commercial terms. Isogon claims that it executed the Master Software License Agreement as a courtesy to Aetna upon its request. The fact that the recited consideration of $3,000 has never been paid bolsters the conclusion that the signing of the Agreement did not reflect a true sale or commercialization of SoftAudit. In addition, the $1 consideration recited in the GIS agreement[4] also supports a finding that there was no § 102(b) sale.

The fact that the Aetna and GIS licenses did not place the SoftAudit product in the public domain or lead the public to believe that the product was freely available also suggests that no commercialization took place here. *See Mahurkar v. Impra, Inc.,* 71 F.3d 1573, 1577 (Fed.Cir.1995) (exclusive licensee's sale of two prototype catheters to one hospital made solely to maintain his status as exclusive licensee held to be a sham that did not result in the commercialization of the invention despite its reduction to practice).

---

**4.** *See* section II. D*., infra.*

Because there is evidence that the Aetna and GIS license agreements were entered into not for profit, but rather to acquire the product data needed for SoftAudit's knowledge base, I cannot conclude, as a matter of law, that Isogon placed its SoftAudit product on sale.[5] For this reason alone, summary judgment must be denied.

### C. *Patentability*

Prior to the Supreme Court's decision in *Pfaff v. Wells Electronics, Inc.,* —— U.S. ——, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), establishing a § 102(b) bar required a showing that the invention was "substantially complete" at the time of the offer for sale. *See Pfaff v. Wells Electronics, Inc.,* 124 F.3d 1429, 1434 (Fed.Cir. 1997). The test for deciding if an invention was substantially complete was whether, at the time of the offer, there was "reason to expect that [the invention] would work for its intended purpose upon completion." *Id.* (quoting *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.,* 103 F.3d 1538, 1545 (Fed.Cir.1997)).

■■■ The substantial completion standard has recently been called into question. *Pfaff,* 119 S.Ct. at 310. According to the Supreme Court, a "rule that makes the timeliness of an application depend on the date when an invention is 'substantially complete' seriously undermines" the "interest in providing inventors with a definite standard for determining when a pat-

ent application must be filed." *Id.* In lieu of substantial completion, the Supreme Court has opted for a two prong test before applying the on-sale bar. *Id.* at 311. First, "the product must be the subject of a commercial offer for sale." *Id.* Second, *"the invention must be ready for patenting." Id.* (emphasis added). This second condition may be satisfied:

> by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.

*Id.*[6]

Amdahl contends that SoftAudit was ready for patenting in October of 1992 under either alternative. First, Amdahl contends that SoftAudit was reduced to practice in October 1992. In support of this allegation, it cites the testimony of Steven Youchnow, an employee and shareholder of Isogon. Youchnow stated that in October of 1992, Robert Barritz had completed the overall structure of SoftAudit (approximately 15,000 lines of code compared to over 150,000 at present) but that "he hardly tested it." Declaration of Steven Youchnow, sworn to August 28, 1998 ("Youchnow Decl."), ¶ 2. Barritz then turned over the SoftAudit project to Youchnow who completed writing major portions of the software. *Id.* at ¶¶ 3–4. Youchnow also stated that "[i]n October

---

**5.** Although Amdahl urges this Court to find the product data to be sufficient consideration for the sale, a distinction must drawn between development and commercialization. No doubt the product data obtained from Aetna and GIS may have helped make SoftAudit a commercially viable product. But, at the time of the licensing agreements, there was no inherent value in the data as it was not yet known whether SoftAudit would function as intended in its natural environment. Accordingly, I decline to retroactively place a value on information which may have proved useless in order to find a sale for purposes of the § 102(b) bar. In any event, payment alone does not *per se* create a section 102(b) bar. *See TP Laboratories, Inc. v. Professional Posi-*

*tioners, Inc.,* 724 F.2d 965, 971–72 (Fed.Cir. 1984).

**6.** "A process is reduced to practice when it is successfully performed. A machine is reduced to practice when it is assembled adjusted and used. A manufacture is reduced to practice when it is completely manufactured. A composition of matter is reduced to practice when it is completely composed." *Id.* at 307 (quoting *Corona Cord Tire Co. v. Dovan Chemical Corp.,* 276 U.S. 358, 383, 48 S.Ct. 380, 72 L.Ed. 610 (1928)). In other words, the test for reduction to practice is whether the invention was known to work for its intended purpose. *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1578 (Fed.Cir.1996).

1992, I recall SoftAudit was a barely working software product, in its pre-beta phase (commonly referred to as an alpha version)". *Id.* at ¶ 12. Further evidence of reduction to practice offered by Amdahl is the following deposition testimony of Mr. Youchnow:

Q: In the context of the work you were doing in 1992 of SoftAudit using your definition of working, was it working in any environment?

A: It was working on my very limited platform.

Q: And that was GIS?

A: Right, and only in my own uniquely defined universe.

Q: In that unique universe of GIS with that operating system, it produced one or more reports?

A: Yes.

Q: But with all those characterizations, you would say it was operating or working in that environment, that GIS environment, is that fair?

A: My corner of the GIS environment, yes.

Deposition of Steven Youchnow, pp. 106–07, 1. 23–9, pp. 107–08, 1. 23–2, p. 108, 1. 11–16 (attached as Exh. Q to Amdahl's Reply Memorandum).

Second, Amdahl contents that sufficient documentation existed in October 1992 to satisfy the second prong of the "ready for patenting" test. Amdahl points to a copy of a SoftAudit user's manual, dated October 21, 1992, which includes a drawing entitled "How SoftAudit Works." *See* Exh. H to Amdahl Memo. at 5. This drawing depicts the elements of the invention connected in the same manner as that shown in a 1993 user's manual. *See* Exh. I to Amdahl Memo. at 5 (showing Surveyor, Monitor and Reporter elements connected in the identical manner). The user's manual is incorporated by reference into the 1992 Agreement and Isogon warranted that its programs would function "as set forth in Isogon's User Documentation and published specifications." *See* Exh. A to Amdahl Memo. at 3–4.

According to Isogon, SoftAudit was not ready for patenting in October 1992. At that point, Isogon still needed to ascertain whether SoftAudit was operable for its intended purpose in its intended environment (main frame computers). As stated by Robert Barritz, "[t]he task in October 1992 was to secure the cooperation of one or more operators of large main frame facilities to allow Isogon access to main frame computers to thoroughly test the software, and to obtain from such facilities product data information for the knowledge base." Barritz Decl., ¶ 13. Mr. Barritz stated that the program was not released for presentation to customers until March of 1993. *See* Deposition of Robert Barritz, p. 27, 1. 14–17 (attached as Exhibit A to the Declaration of Max Moskowitz, attorney for plaintiff, sworn to August 31, 1998 ("Moskowitz Decl.")).

In testing SoftAudit, Mr. Youchnow had constant and ongoing telephone contacts with Ana Hanson with whom he worked to test, revise and attempt to mold the SoftAudit product into a completed product in the 1992 and 1993 time frame. Youchnow Decl., ¶¶ 8, 10. According to Youchnow, Aetna became disenchanted with the project and failed to supply Isogon with the information needed for the knowledge base. *Id.* at ¶ 11. Isogon characterizes Ana Hanson's testimony as hazy because she could not recall whether she worked on the project in 1992 or 1993 or whether she was able to produce reports in 1992 or 1993. *See* Hanson Dep., p. 10, 1. 8–12, p. 16, 1. 2–11. (attached as Exh. B to Moskowitz Decl.). She did concede that in 1993, reports that were generated could not correlate module names with product names. *Id.* at p. 33, 1. 8–14.

As proof that Aetna was not yet satisfied with SoftAudit, Isogon noted that in May 1993, Debby Wilmes of Aetna's Software Engineering Department, wrote in an internal e-mail that she has agreed to test yet another version of SoftAudit and com-

mitted that "we will put effort into it this time." *See* Exh. A to Barritz Decl. Stephen D. Berkowitz, an Isogon employee responsible for the Aetna account, commented on June 8, 1993 about a conversation with Aetna: "things seem to be better w/SoftAudit... the ball is back in their court," indicating a willingness to continue testing.[8] *See* Martin Decl., Exh. A.

The situation then took a turn for the worse. As of October 5, 1993, Aetna had not released SoftAudit for use within the Aetna organization because of operational problems. Internal e-mail form Aetna's Software Engineering Department identified the SoftAudit project as the "ISOGON–JOINT DEVELOPMENT SOFTAUDIT." Moskowitz Decl., Exh. C. A November 10, 1993 Aetna e-mail from Debby Wilmes summarized the situation as follows:

> SoftAudit was brought into Aetna in the fall of 1992. Since that time our people have worked to implement the product. Numerous problems have been encountered with the product that have impacted system reliability.

> On paper, the product sounds wonderful... In reality, we have gained nothing in a year of effort.

> Therefore, it is my recommendation that we shelf [sic] this product.

Moskowitz Decl., Exh. D. An e-mail from Ms. Wilmes dated May 9, 1994 confirmed: "The product that Fred was trying to bring in (SoftAudit) never got implemented beyond initial testing because it caused so many problems." Moskowitz Decl., Exh. E.

In light of the above, there is a factual issue regarding SoftAudit's degree of completion in October 1992. Similar issues

were found in *Seal–Flex, Inc. v. Athletic Track and Court Constr.*, 98 F.3d 1318 (Fed.Cir.1996), where the court stated: "It was incorrect to hold, as a matter of law, that the on-sale bar accrued because 'the invention was sufficiently complete,' although it had not yet been determined whether the [patented] method did in fact produce an all-weather surface." *Id.* at 1322. The court concluded:

> When an evaluation period is reasonably needed to determine if the invention will serve its intended purpose, the § 102(b) bar does not start to accrue while such determination is being made. *This is a factual issue, and could not be found adversely to the non-movant on summary judgment.*

*Id.* at 1324 (emphasis added). *See also Robotic Vision Sys., Inc. v. View Engineering, Inc.*, 112 F.3d 1163, 1168 (Fed. Cir.1997) (court reversed summary judgment where software program needed to implement the invention was not even close to completion a the time of the alleged offer—whether it was completed before or after the critical date presented a genuine issue of material fact since "[w]ithout a substantially completed invention, there could be no on-sale bar").

However, whether the invention is substantially complete before the critical date is no longer the applicable test. Instead, the Court must focus on whether the invention is ready for patenting. Here, there is conflicting evidence concerning SoftAudit's patentability as of October 1992. Amdahl alleges that the invention was reduced to practice by this time while Isogon claims that it was in a developmental stage in need of testing in its natural environment. Moreover, given the nature and complexity of SoftAudit, it would be

---

8. Apparently the mood at Isogon was optimistic in the Spring of 1993. In a letter dated April 29, 1993, Gerald Sindler, Isogon's then Vice President of Finance, wrote the following to a European software distributing company:

> SoftAudit is a brand new product. We have only our test installation as a reference and have not sold a single one... We have about 20 (count them) major deals working regarding SoftAudit, and the product promises to be a blockbuster. But I will not jerk our business partners around or mislead them, so the answer is that we have not even one bona-fide customer as of today.

Barritz Decl. Exh. C.

difficult to say, as a matter of law, that the 1992 User's Manual was sufficiently specific to enable a person to actually use the product and hence satisfy the second prong of the newly articulated standard for patentability. However, because summary judgment is already precluded by issues of commercialization and experimentation, I need not decide this issue.

### D. *Experimental Use*

During the same period in October 1992, Isogon made an agreement with GIS, similar to that made with Aetna, wherein it requested access to mainframe computer facilities and product information in exchange for agreeing to supply a copy of SoftAudit for $1. Barritz Decl., ¶ 22. The grant of the license to GIS was "subject to successful operation of SoftAudit & acceptance by GIS Information Systems." *Id., see also* Exh. B attached thereto. GIS did not use the SoftAudit product in 1992 and only began using the product in the middle to late portion of 1995. *See* Deposition of Thomas M. Agostino, an employee of GIS, p. 49, 1. 6–12 ("Agostino Dep."). Regarding 1992 activities between Isogon and GIS, Mr. Agostino testified as follows:

Q. I want to know everything that GIS did in collaboration with Isogon with respect to Isogon's use of GIS's computers in 1992.

A. Okay. I know that—I can tell you that we provided Isogon with a special processing environment to facilitate the development of that product, but I don't know exactly when that was. I can't say whether it was before or after 1992.

Q. Why did Isogon get a special processing environment?

A. In the process of developing systems software there was some risk associated with the programs that were developing and the integrity of our operating system environment. They could do things that would potentially cause our system to crash and that would have an impact on the rest of our customers.

We didn't want to see that happen. We gave a special test environment that was dedicated for the development of this product so they wouldn't have any exposure on the rest of our customers.

Agostino Dep., p. 28, 1. 17–24, p. 29, 1. 7–19. Regarding the motivation for entering into the 1992 agreement, Mr. Agostino explained:

A. Frank [Burns] and I talked about the circumstances surrounding the signing of the agreement in October of 1992... But the circumstances leading up to that were that GIS would provide Isogon with this isolated or dedicated testing environment/development environment for this product, and in turn Isogon would license the product to GIS essentially for free.

*Id.,* pp. 85–86, 1. 20–4.

 Assuming, *arguendo,* that the transaction with either Aetna or GIS represented an actual sale[9], this inquiry would not end. Although the "on-sale bar invalidates a patent for an invention offered for sale, even though not ready for satisfactory commercial marketing," *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.,* 970 F.2d 834, 836 (Fed.Cir.1992) *(citing Barmag Barmer Maschinenfabrik v. Murata Mach.,* 731 F.2d 831, 838 (Fed. Cir.1984)), "[a]ll of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b)." *UMC Electronics Co. v. United States,* 816 F.2d 647, 656 (Fed.Cir.1987). "A sale made because the purchaser was participating in experimental testing creates no on-sale

9. Both need not qualify as a single sale or offer to sell suffices to bar patentability. *In re*

*Caveney,* 761 F.2d 671, 676 (Fed.Cir.1985).

bar." *Id.* at 657.[10] Furthermore:

> If a patent owner seeks to avoid the on-sale bar on the basis that a sale or offer was experimental, a trial court must determine whether the patent owner sought the sale primarily for profit rather than as part of a testing program. To determine whether profit motivated a transaction, a court must examine the claimed features, the offeror's objective intent, and the totality of the circumstances.

*Atlantic Thermoplastics,* 970 F.2d at 836 (internal citations omitted). In determining whether a sale was for experimental purposes, courts have considered the following factors:

> [T]he necessity for public testing; the amount of control retained over the operation, the extent of public testing in relation to the nature of the invention, the length of the test period, whether any payment was made, whether there was a secrecy obligation, whether progress records were kept, who conducted the experiments, and the degree of commercial exploitation during the tests in relation to the purpose of the experimentation.

*Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1564 (Fed.Cir.1987) (internal citations omitted).

 For example, in *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544 (Fed.Cir.1990), the inventor sought permission from Wyoming state officials to try his new iris arm design [11] at a rest area not yet open to the public. *Id.* at 547–48. According to the patent holder, the new design's durability in weather conditions was unknown and testing under wind, cold and corrosive atmospheric conditions was needed. *Id.* at 548. The iris arm device was installed in November 1971 and in April 1972, Wyoming officials inspected the device and authorized payment. *Id.* at 548. The patent holder approved the iris arms for commercial use on March 10, 1972 and filed its patent application on February 5, 1973. *Id.*

The Court of Appeals refused to find an on-sale bar resulting from the Wyoming installation. *Id.* at 551. In so doing, it stated that "[p]rior to its testing in the winter environment, there really was no basis for confidence by the inventor that the invention would perform as intended." *Id.* at 550 (citing *Gould Inc. v. United States,* 217 Ct.Cl. 167, 579 F.2d 571, 583 (1978) for the proposition that the period of experimental use continues until after the inventor "conducts tests needed to convince himself that the invention is capable of performing its intended purpose in its intended environment"). The fact that the patent holder was compensated by Wyoming officials did not prevent the court from finding that experimentation, and not profit, was the primary motive behind the Wyoming installation. *Id.* At the time of the Wyoming installation, "testing in the outdoor environment was necessary to determine whether the invention worked as intended, and [the patent holder] clearly regarded the installation itself as an experiment." *Id.* at 551.

A similar result can be found in *TP Laboratories.* There, an orthodontist/inventor used a patented tooth positioner on three patients well before the critical date in order to determine if the new positioner represented an improvement over existing technology. The court disagreed with the

---

10. The Supreme Court has recently reiterated the well-established proposition that "an inventor who weeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention... The law has long recognized the distinction between inventions put to experimental use and products sold commercially." *Pfaff,* 119 S.Ct. at 309.

11. These "iris" guide arms were part of a new, self-centering luminaire assembly design capable of traveling readily up and down a pole. The guide arms were intended to apply forces between the light pole and the luminaire support such that the assembly maintains a centered position while on the pole. *Id.* at 547.

district court that had "placed a heavy burden of proof on the patent owner to prove that the inventor's use had been experimental." 724 F.2d at 969–70. According to the court:

> [T]he statutory presumption of validity provided in 35 U.S.C. § 282 places the burden of proof upon the party attacking the validity of the patent, and that burden of persuasion does not shift at any time to the patent owner. It is constant and remains throughout the suit on the challenger.

*Id.* at 971.

The court refused to find a § 102(b) bar for public use as the use of the invention on three patients was not excessive. *Id.* at 972. "[T]he test of necessity had to run for a considerable time and on several patients before the inventor could know whether 'it was what he claimed it to be' and would 'answer the purpose intended.'" *Id.* (quoting *City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. 126, 136, 24 L.Ed. 1000 (1877)). Another factor in the patentee's favor was that no commercial exploitation had been made prior to filing the patent application. *Id.* at 973.

Here, Isogon has come forward with convincing evidence that the use of SoftAudit in October 1992 was experimental. Among other things, Isogon's president testified that the invention's knowledge base was not sufficiently populated at this time to know whether it would function as intended. Moreover, the fact that the SoftAudit product was given its own discrete testing environment at GIS is further proof of experimentation. If the product was being commercially exploited, it would hardly seem necessary to provide an isolated environment to shield any unwanted results from the main operating system. Similarly, there is evidence that the product did not leave Aetna's Software Engineering Department before the critical date. Thus, Isogon has put forth sufficient evidence to create a genuine issue of material fact regarding the nature and extent of SoftAudit experimentation during the rele-

vant time period. Summary judgment is therefore inappropriate.

### III. *Conclusion*

In short, I find that there are genuine issues of material fact with regard to the commercialization and experimentation of SoftAudit during the period in question. Accordingly, defendant's motion for summary judgment is denied as is plaintiff's suggestion that summary judgment be granted in its favor. *See Orix Credit Alliance, Inc. v. Horten,* 965 F.Supp. 481, 484 (S.D.N.Y.1997) (summary judgment can be granted to non-movant despite absence of a formal cross-motion where the court determines that the factual record can be resolved in its favor). The questions posed above are best left to the trier of fact.

SO ORDERED.